**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

---

| | |
|---|---|
| THOMAS CLARK, | x |
| | : |
| Plaintiff, | : |
| | : |
| v. | : |
| | : |
| E.I. DUPONT DE NEMOURS & COMPANY, | : |
| | : |
| Defendants, | : |
| | x |

Jury Trial Demanded

---

## COMPLAINT

Plaintiff, Thomas Clark, on his own behalf and on behalf of all other Class members, by and through his undersigned counsel, allege as follows for his Complaint:

## I.   INTRODUCTION

1.     This is a class action seeking monetary and other relief arising from E.I. DuPont De Nemours & Company's ("DuPont") unfair and deceptive trade practices in making fraudulent, false, misleading, and deceptive representations, and corresponding material omissions, about the purported safety of a cookware coating product manufactured and sold by DuPont under the common name "Teflon®." DuPont knew or should have known, but failed to disclose to the consuming public, that cookware coated in DuPont's Teflon® product, when used as intended under normal everyday circumstances, can release harmful and dangerous substances, chemicals, and particulates, including toxins and likely human carcinogens, exposing consumers to potentially serious health risks.

-1-

2.      Dupont designed, manufactured, distributed, sold, advertised and marketed Teflon®, using these unfair and deceptive misrepresentations and omissions, when it knew or should have known - based on, *inter alia*, studies that DuPont conducted on its own workers - that Teflon® contains numerous substances, including a chemical compound called PFOA, which are dangerous and harmful to the public, which can be released when cookware coated with Teflon® is used as intended, which have bioaccumulative and biopersistent properties, and which can pass from mothers to their children *in utero*.

3.      Consumers, including Plaintiff and the members of the Class, purchased cookware coated with DuPont's Teflon® product, without knowing of the risks and dangers that Teflon® posed to them and their families. DuPont's misrepresentations and omissions, as detailed herein, ensured that consumers either entered into transactions to purchase Teflon® coated cookware that they would not otherwise have purchased had the truth about Teflon® been disclosed or else paid too high a price for the Teflon® coated cookware that they did purchase.

4.      This action is brought to require DuPont, *inter alia*, (I) to pay damages and/or restitution to the Plaintiff and other Class members who purchased cookware coated with DuPont's Teflon® product; (ii) to disgorge its ill-gotten profits from the sale of Teflon® as a cookware coating product; (iii) to create a fund for ongoing medical monitoring of persons who have purchased cookware coated with Teflon® ; (iv) to create a fund for independent scientific researchers to investigate further the potential for adverse health effects to persons who have used cookware coated with Teflon®; and (v) to enter an injunction barring DuPont from continuing to license, design, manufacture,

market, advertise, sell and/or distribute its Teflon® product as a cookware coating or, alternatively, an injunction requiring DuPont and its licenses to provide an adequate warning label, disclosing the risks and hazards of Teflon®, on all Teflon® coated cookware sold in the future.

## II.     PARTIES

5.     Plaintiff, Thomas Clark, is a Connecticut resident who purchased and used within Connecticut cookware coated with DuPont Teflon® product.

6.     Defendant DuPont is a Delaware corporation. DuPont designs, manufactures, advertises, markets, sells, distributes and/or licenses Teflon® for use in numerous consumer goods, including cookware, sold throughout the State of Connecticut and elsewhere.

## III.    JURISDICTION AND VENUE

7.     This Court has subject matter jurisdiction pursuant to 28 U.S.C.A. §1332 (a)(1) and (d)(2) in that this action seeks monetary relief in excess of $5,000,000.00, exclusive of interest, costs and attorneys' fees and is between citizens of different States.

8.     Venue is appropriate in this judicial district pursuant to 28 U.S.C. §1391 because a substantial part of the events or omissions giving rise to the claims occurred in the District of Connecticut.

9.     Defendant DuPont is subject to the jurisdiction of this Court pursuant to Connecticut General Statutes §52-59b by:

(a)     transacting business in the State;

(b)     committing the tortuous acts within the State;

©       committing a tortuous act outside the State causing injury to

persons in the State;

(d)     regularly conducting or soliciting business, or engaging in other

persistent course of conduct, or deriving substantial revenue from

goods used or consumed or services rendered in the State;

(e)     engaging in acts which it expected, or reasonably should have

expected, to have consequences in the State and derives

substantial revenue from interstate or international commerce.

## IV.     BACKGROUND AND GENERAL ALLEGATIONS.

**A.      Teflon®'s History and Commercial Success, DuPont's Repeated Claims Regarding Its Safety and Fitness for Use as A Cookware Coating, and DuPont's Licensing of Teflon® for this Use.**

10.     DuPont was founded in 1802.

11.     DuPont operates in more than seventy (70) countries.

12.     Teflon® was invented in 1938 at DuPont's Jackson Laboratory.

13.     Teflon® is DuPont's trademarked name for the chemical product called

polytetrafluoroethylene (PTFE).

14.     DuPont has registered the Teflon® trademark in 19 countries and first

began selling Teflon® commercially in 1946.

15.      As DuPont proudly boasts in its Teflon® website, www.teflon.com:

Teflon® is really everywhere. Not only can you find it in your clothes and
on your cookware, but you can also find it on products on almost every

-4-

continent.[1]

16.     DuPont's Teflon® product is commonly used as a cooking surface coating in "non-stick" cookware, such as in pots and pans, stir fryers and woks, pizza pans, breadmakers, cookie sheets, griddle pans and skillets, wafflers, deep fryers, crock pots, roasting pans, cake pans and molds, and other common cooking utensils and aids.

17.     DuPont's Teflon® product and the chemicals used in its production together represent a $2 billion per year industry.

18.     DuPont nets an estimated $200 million per year from its sale of Teflon®.

19.     DuPont has advertised and represented to the public that Teflon® makes life easy, and reportedly has called Teflon® a "housewife's best friend."

20.     DuPont claims on its Teflon® website, www.teflon.com, that "the Teflon® brand is one of the world's most recognized and respected" brands and has strong consumer recognition.

21.     During the last fifty (50) years, DuPont's scientists have studied whether products containing Teflon® are safe for use by consumers. DuPont has represented to consumers in public statements and documents, in press releases and on its websites that  Teflon® is safe for consumer use and has denied that the cookware coated with its Teflon® product can be harmful to human health.

22.     DuPont's Teflon® website, www.teflon.com, is replete with statements touting the safety of Teflon® coated cookware, such as "Cookware made with Teflon®

---

[1]See http://www.teflon.com/NASApp/TeflonPageServlet?pageId=/consumer/na/eng/brandWorld/regional_product_list.html.

non-stick coating is totally safe for everyday use."[2]

23.    DuPont has backed such claims with boasts, such as the following, of its decades of quality assurance and testing work concerning cookware that is coated with its Teflon® product:

> DuPont certification seal means you can trust cookware to meet the toughest DuPont standards for quality and performance. Standards are upheld by a unique 13-point checklist for quality assurance. Plus, DuPont tests cookware in a rigorous battery of real-world tests, including over 30 years of in-home kitchen testing and an ongoing program of professional chef testing conducted in commercial restaurants. [3]

24.    In addition, Dupont has represented to consumers that it retains oversight and control of the use of its Teflon® product by licensees who wish to combine it with their cookware products. For example,

> Before a manufacturer is licensed to use a DuPont non-stick coating, they must submit their products to DuPont to make certain that exacting quality standards are met. Once a Manufacturer is licensed, DuPont conducts periodic testing to ensure that those standards are consistently upheld Finally, each manufacturer conducts in-house tests against their own quality standards.[4]

25.    Dupont has knowledge of all licensees authorized to manufacture or sell cookware coated with or otherwise incorporated its Teflon® product and knowledge of the brand and model names so marketed. Upon information and belief, and subject to information obtainable only through pre-trial discovery, DuPont has licensed the use of

---

[2] See, e.g., http://www.teflon.com/Teflon/downloads/pdf/facts_about_teflon.pdf.

[3] See, e.g., http://www.teflon.com/NASApp/Teflon/TeflonPageServlet?...ookware/cookware/nonstick/howDoesIt/cons_how_work.html.

[4] Id.

the Teflon® for use by, *inter alia*, the following manufacturers and/or models of cookware:

| Manufacturer | Models |
|---|---|
| All Clad | Emerilware<br>LTD<br>Cop-R-Chef<br>Copper-Core<br>MC2 |
| Analon | Analon Titanium<br>Advanced<br>Classic<br>Professional<br>Suregrip Bakeware |
| Basic Essentials | |
| Bodum | |
| Chef's Planet | Arc-42 Cookware<br>Tefmat Oven & Bake Liners |
| Circulon | Circulon Total<br>Elite<br>Premier<br>DuPont Autograph<br>Circulon Electrics |
| Cresware | DuPont "Supra Select"<br>Platinum Pro<br>Silverstone Xtra<br>Silverstone Professional |
| Cuisinart | Chef's Classic |
| DuPont | Autograph<br>Platinum Pro<br>Platinum Select<br>Xtra<br>Classic |

| Farberware | Farberware, Inc. Farberware Millennium Farberware Noinstick Aluminum Restaurant Pro Enhanced Nonstick Cookware Select Vibrance Cooks Kitchen Classic Series Nonstick Skillets Farberware Nonstick Bakeware |
|---|---|
| GAU | |
| GSI | Bugaboo |
| Kitchenaid | Gourmet Excellence Gourmet Essentials |
| Megaware, Inc. Of California | Castalon Castame Triomphe Concorde Magnifica |
| Newell Rubbermaid | Calphalon |
| Royal Cougar | |
| Salton | |
| Silverstone | Culinary Colors Series Nonstick Stainless Steel Series |
| T-Fal | Jamie Day Gourmet |
| Wearever | Mirro Regal Wearever |

**B.     Teflon® Chemical Components, Their Toxic and Dangerous Properties, and DuPont's Knowledge and Non-disclosure Thereof**.

**1.     Perflourooctanic acid (PFOA)**

26.     Perflourooctanic acid (PFOA) is a perflourinated detergent/surfactant that

is manufactured, processed and/or distributed by DuPont in connection with its manufacture of Teflon®. PFOA is also sometimes referred to by DuPont as "C-8."

27.     PFOA is the chemical used to give DuPont's Teflon® product its legendary "non-stickness."

28.     DuPont has conducted both animal and human studies and tests on PFOA. In addition, DuPont had knowledge of studies and tests conducted by others, including 3M, another manufacturer of PFOA.

29      PFOA is man-made and does not occur anywhere in nature.

30.     PFOA is nonetheless now found to contaminate the blood of humans in all geographic regions of the United States. For example, a 2001 study by 3M Corporation found that PFOA was present in the blood of ninety six percent (96%) of the 598 children tested. The children were located in 23 States.

31.     PFOA is a liver toxin in animals, is biopersistent in humans and animals, and is bioaccumulative in humans.

32.     PFOA is associated with health concerns in animals, including cancer and developmental defects.

33.     Studies have indicated that PFOA causes developmental toxicity and other adverse effects in animals.

34.     In 1981, 3M advised DuPont that PFOA may cause birth defects in laboratory animals.

35.     Also in 1981, DuPont possessed a document describing the results of a blood sampling study DuPont conducted on eight (8) of its pregnant employees at the plant where PFOA is manufactured. This document identified the levels of PFOA in the

blood of DuPont's pregnant employees and described the status of the child.

36.     A purpose of DuPont's blood sample study was to monitor these pregnant employees for PFOA exposure, to monitor umbilical cord blood for the presence of PFOA, and to test the babies' blood for the presence of PFOA.

37.     The 1981 document demonstrates the presence of PFOA in the umbilical cord blood of at least one of the eight (8) Dupont employees and in the blood of another worker's baby. Thus, DuPont knew or should have known from this study that PFOA moved from mother, through the placenta, to the fetus.

38.     In 1982, DuPont reported data to the EPA regarding the transplacental movement of PFOA in rats. The EPA considered this information to be "substantial risk data." DuPont failed to disclose to the EPA, however, both its possession of human blood sampling data from 1981 that confirmed the transplacental movement of PFOA in humans and the information it had about the presence of birth defects (described below) in the babies of its female workers exposed to PFOA.

39.     The EPA contends that DuPont's human blood sampling information demonstrating the transplacental movement of PFOA "reasonably supports the conclusion that PFOA  presents a substantial risk of injury to human health."

40.     More specifically, the EPA contends that DuPont's human blood sample data demonstrating that PFOA crosses the human placental barrier between PFOA exposed mothers and their fetuses suggests that the fetuses could experience toxic effects from PFOA, including bioaccumulative and, as observed in animal tests, developmental toxicity and liver toxicity.

41.     The EPA considers DuPont's human blood sampling information that

confirms transplacental migration of PFOA "to reasonably support the conclusion of a substantial risk of injury to health or to the environment."

42      Moreover, the EPA considers DuPont's blood sample data confirming the transplacental movement of PFOA to be "known toxicological information" about PFOA of which DuPont was aware.

43.      Additionally, documents maintained by DuPont chronicling the health of babies born to DuPont workers exposed to PFOA indicate birth defects in two (2) of seven (7) babies. One child had eye and tear duct defects and the second had nostril and eye defects.

44.      Among other things, as a result of DuPont's failure to disclose its 1981 blood sample data to the EPA, the EPA launched an investigation into DuPont's concealment of its study information and determined that DuPont engaged in unlawful behavior by concealing the blood sample study results.

45.      Dupont's concealment of its 1981 blood sample study information protected the continued commercialization and marketability of DuPont's Teflon® product and the profits received by DuPont from Teflon® sales. As the EPA pointedly states in its complaint against DuPont contending that DuPont violated the Federal Toxic Substance Control Act from June 1981 to March 2001 by not reporting health risks from exposure to PFOA:

> [the EPA's efforts to investigate the risks posed by PFOA]
> might have been more expeditious had the data on
> transplacental movement of the chemical in humans been
> submitted immediately by DuPont when DuPont obtained
> the information in 1981.

46.      DuPont has settled the claims brought by the EPA claiming it violated the

Federal Toxic Substances Control Act and the Resource Conservation and Recovery Act by withholding information from the agency about the potential health and environmental risks of PFOA. As a condition of the settlement, DuPont agreed to pay a combined $16.50 million, including $10.25 million in fines and $6.25 million for environmental projects (including a research program to evaluate the potential for biodegration of chemicals such as PFOA).

47.     EPA officials have stated that this settlement represents the largest civil administrative penalty the agency has ever obtained under any federal environmental statute. Discussing the Dupont settlement, Granta Nakayama, EPA's Assistant Administrator for Enforcement and compliance, stated, "This sends a strong message that companies are responsible for promptly giving EPA risk information associated with their chemicals."

48.     Despite this settlement, the federal government's interest in and concerns over PFOA continue. The EPA is even now continuing its risk assessment process for PFOA. In a draft report released in the summer of 2005, the majority of members on a scientific advisory board that reviewed the EPA's draft risk assessment concluded that PFOA is "likely" to be a human carcinogen, a finding that went *beyond* the EPA's determination that there was "suggestive evidence" from animal studies that PFOA and its salts are potentially carcinogenic in humans.

49.     Further, in May, 2005, a federal grand jury from the Justice Department's Economic Crimes Section issued a subpoena to DuPont regarding DuPont's use of PFOA.

50.     There are numerous additional facts and studies that demonstrate that

exposure to PFOA causes adverse health effects. PFOA has been linked to cancer, organ damage and other negative health effects in tests on laboratory animals. For example, male and female rats and mice have developed several different kinds of tumors when exposed to PFOA.

51.     Various studies have confirmed that exposure to PFOA causes or may cause vascular disease in humans. For example, it is reported that workers exposed to PFOA at 3M's plant in Cottage Grove, Minnesota demonstrated a statistically significant, elevated risk of dying from cerebrovascular disease. Findings of vascular disease have also been reported in a study of DuPont workers exposed to PFOA. Additionally, DuPont's study of the blood of its workers demonstrated a statistically significant correlation between cholesterol and PFOA. Similarly, there was also a statistically significant correlation between cholesterol and PFOA found in a study of Italian workers exposed to PFOA. Moreover, there are animal studies showing changes in blood chemistry associated with PFOA exposure that bolster these human study results.

52.     Studies have also shown that exposure to PFOA correlates to incidences of prostate cancer in humans. For example, workers at 3m'S Cottage Grove Plant exhibited a statistically significant association between the length of workplace PFOA exposure and prostate cancer mortality. Moreover, an elevated risk of dying from prostate cancer was found among certain workers exposed to PFOA. Workers at 3M's Decatur, Alabama plant exhibited an increase in demand for medical care for male reproductive cancers (including prostate) compared to the general population, with the greatest increases among those workers in the long-time, high-PFOA-exposure category.

53.     There are numerous other studies demonstrating many potential health risks related to exposure to PFOA. Some of these studies include:

a.      Two analyses of leukemia incidence were conducted from 1956-1989 showing statistically increased odds ratios for workers in DuPont's Washington Works plant from 1956-1989. Additionally, a general mortality study found an increase in leukemia.

b.      Workers exposed to perfluorochemicals at 3M's Decaturç Alabama plant exhibited significantly increased numbers of episodes of care for intestinal tumors versus those not exposed occupationally. An elevated increase of risk of dying from cancer of the large intestine was also seen in those exposed to PFOA in 3M's Cottage Grove, Minnesota plant compared to the general population.

c.      At 3M's Cottage Grove, Minnesota plant an elevated risk of dying from pancreatic cancer or pancreatic disease was seen among workers exposed to PFOA versus those not exposed occupationally.

d.      At 3M's Cottage Grove, Minnesota plant an elevated risk of dying from cancer of the testis or other male reproductive cancers was seen among workers exposed to PFOA versus those not exposed occupationally.

e.      A 3M-sponsored animal study found a statically significant increase in fibroademonas (mammary tumors) correlated with PFOA dose.

f.      There are also studies that demonstrate PFOA may be related to adverse pituitary effects and immunological function.

54.     The EPA has recently identified significant human health concerns from exposure to PFOA.

55.     On June 27, 2005, a panel of the EPA's Science Advisory Board ("SAB") released a draft of its conclusions after reviewing the EPA's report entitled "Draft Risk Assessment of the Potential Human Health Effects Associated with Exposure to Perfluorooctanoic Acid (PFOA)."

56.     A majority of members of the EPA's SAB concluded that PFOA was likely to cause cancer in humans. The SAB stated:

> that the experimental weight of the evidence with respect to the carcinogenicity of PFOA was stronger than [previously determined by the EPA], and suggested that **PFOA is a 'likely' Carcinogen in humans.** Accordingly to the EPA's Guidelines for Carcinogen Risk Assessment (also known as EPA's Cancer Guidelines), this descriptor is typically applied to agents that have tested positive in more than one species, sex, strain, site or exposure route, with or without evidence of carcinogenity in humans.

(Emphasis added.)

57.     On February 15, 2006, a group of scientific advisors to the EPA, the Science Advisory Board ("SAB"), voted unanimously to approve a recommendation that PFOA should be considered a "likely carcinogen."  The EPA will use the SAB's report "as well as all new information that becomes available to formulate the next steps in our continuing assessment of these chemicals," said Oscar Hernandez, director of the risk assessment division in the EPS's Office of Pollution Prevention and Toxics.

58.     A recent study by the Centers for Disease Control showed that PFOA has contaminated the bloodstream of fetuses throughout the United States.

**2.     Other Chemicals Contained in Teflon® and Released through Use of Teflon® Coated Cookware.**

59.      Over 40 years ago, DuPont conducted human experiments with Teflon®-laced cigarettes to determine why certain workers were becoming sick on the job with a Teflon®-related illness commonly called Polymer Fume Fever. DuPont laced the cigarettes of its volunteers with Teflon® and had the volunteers inhale the cigarette fumes until they became sick. In these dosing experiments up to 90% of the people in the highest dose group became ill for an average of 9 hours, demonstrating flu-like symptoms, including chills, back ache, fever and coughing. These symptoms are commonly linked to Polymer Fume Fever.

60.      Morever, apparently aware of the adverse effects in humans of inhaling heated particulates of fumes emitted by Teflon®, DuPont required its employees to wear respirators when working with Teflon® heated to 400°f (or more) while in poorly ventilated areas. Experiments demonstrate that when cooking in the home, the surface of a Teflon® coated pan can reach this temperature within *2 minutes* using a conventional stove top burner set on high.

61.      Reports indicate that a Teflon® coated pan reached 721°f in just five minutes. DuPont studies show that Teflon® emits toxic particulates at 446°f. At 680°f Teflon® coated pans release at least six toxic gases, including two carcinogens, two global pollutants, and MFA, a chemical lethal to humans at low doses. At temperatures that DuPont scientists claim are reached on stovetop drip pans (1000°f), Teflon® non-stick coatings break down to a chemical warfare agent known as PFIB, and a chemical analog of the WWII nerve gas *phosgene*.

62.      For the past fifty years DuPont has claimed that its Teflon® product, when used as a cookware coating, does not emit hazardous chemicals through normal use. In

a recent press release, DuPont wrote that "significant decomposition of the coating will occur only when temperatures exceed about 660°f (340 °c). These temperatures alone are well above the normal cooking range." Reported tests show, however, that Teflon® coated cookware exceeds these temperatures through the common act of preheating a pan on a burner set on high.

63.     The toxic particles and gases emitted when Teflon® heats and the temperatures at which these particles and gases are first emitted, follow:

464 °f - Ultrafine particulate matter: Teflon® produces very small (ultrafine) particles which cause extreme lung damage to rats within 10 minutes of exposure. Longer exposure causes death.

680°f - Tetrafluoroethylene (TFE): The National Toxicology Program considers *tetrafluoroethylene* (TFE) to be a "reasonably anticipated" human carcinogen because it is known to cause        cancer in laboratory animals.

680°f - Hexafluoropropene (HFP): Exposure to fluorocarbons like HFP can lead to eye, nose and throat irritation; heart palpitations, irregular heart rate, headaches, light headedness, fluid accumulation in the lung and possibly death. Long term exposure is associated with decreased motor speed, memory and learning. In mice and rats, inhalation of hexafluoropropene (HFP) causes kidney lesions, decreased numbers of a type of immune cell and increased urination. HFP also causes increased numbers of chromosomal abnormalities in hamster ovaries.

680°f - Difluoroacetic acid (DFA): Kidney toxicity form DFA has been reported in rats.

680°f - Monofluoroacetic acid (MFA, fluoroacetic acid or compound 1080):  Monofluoroacetic acid is toxic. Doses as low as 0.7 to 2.1 mg/kg can kill people. Initially, people report nausea, vomiting, numbness, tingling, anxiety, muscle twitching, low blood pressure and blurred vision. If exposure is high enough, people can have irregular heart rate, heart attacks and severe convulsions leading to respiratory failure.

680°f - Perfluorooctanoic acid (PFOA): The effects of PFOA

are discussed throughout this Complaint.

878°f - Silicon tetraflouride (SiF4): Silicon tetraflouride is a highly toxic, corrosive gas. In the lungs, moisture causes the silicon particles to separate, releasing toxic hydrofluoric acid and also coating the lung with silicon particles. Inhaling hydrofluoric acid can cause eye and throat irritation, cough, difficult breathing, bluish skin color caused by lack of oxygen, lung damage and fluid accumulation in the lung. Long term exposure can cause weight loss, decreased numbers of red and white blood cells (anemia and leucopenia), discoloration of the teeth and abnormal thickening of the bone.

887°f - Perfluoroisobutene (PFIB): Perfluoroisobutene (PFIB) Is toxic. Inhalation can leads to fluid build up in the lung, a condition that can lead to death. PFIB is listed in the Chemical Weapons Convention as a *Schedule 2 compound*. PFIB is many times more toxic than phosgene, a highly toxic corrosive gas also listed as a chemical weapon.

932°f - Carbonyl fluoride (COF2): Breakdown of Teflon® in the air if the major source of carbonyl fluoride exposure. Carbonyl fluoride is the fluorine version of phosgene, a Chlorinated chemical warfare agent. Carbonyl fluoride fumes can irritate eyes, ears and nose. More serious symptoms of exposure include chest pains, breathing difficulty, fluid accumulation in the lungs, weakness, liver damage and increased glucose levels.

932°f - Hydrogen fluoride (HF): Hydrogen fluoride (HF) is a toxic corrosive gas, and can cause death to tissue it comes into contact with, including tissue in the lungs. Breathing HF can cause severe lung damage, such as fluid buildup in the lungs and inflammation of the lung passages.

1112°f - Trifluoroacetic acid fluoride (CF3COF): Trifluoroacetic acid fluoride is toxic when it breaks down into hydrogen fluoride and trifluoroacetic acid.

1112°f - Octafluorocyclobutane (OFCB): Inhaling high levels of octafluorocyclobutane can cause heart beat irregularities, unconsciousness and death. People with pre existing heart conditions may be extra vulnerable.

**C.      DuPont's Failure to Disclose the Risks and Dangers Posed by
         Teflon®, and the Chemicals it Contains, When Teflon® is Used as a
         Cookware Coating.**

64.      DuPont at all times relevant did not disclose to consumers any of the

preceding studies, tests, or data discussed herein.

65.      DuPont at all times relevant did not issue warnings to cookware

consumers setting forth the risks and dangers of Teflon®, PFOA, or the other chemicals

found in Teflon®, as discussed herein.

66.      DuPont at all times relevant did not instruct or require that its Teflon®

licensees, who manufacture the cookware onto which DuPont's Teflon® product is

applied, issue warnings to cookware consumers setting forth the risks and dangers of

Teflon®, PFOA, or other chemicals found in Teflon®, as discussed herein.

67.      Instead, DuPont has continually represented to consumers in public

statements and documents, in press releases and on its websites that there is no danger

posed by PFOA when using cookware coated with its Teflon® product and has denied

that the use of Teflon® coated cookware can be harmful to human health.

68.      DuPont likewise has continuously claimed that the use of its Teflon®

product as a cookware coating is completely safe.


**VI      CLASS ACTION ALLEGATIONS**

69.      This action is brought as a class action pursuant to Rule 23 of the Federal

Rules of Civil Procedure and pursuant to Connecticut General Statutes § 42-110g(b)

and § 52-105.

-19-

70.     Plaintiff bring this action both in his individual capacity, and as representative of a Class consisting of all persons who have purchased in the State of Connecticut cookware that was coated with or otherwise contains DuPont's Teflon® product and who were damaged thereby.

71.     The size of the Class is currently unknown but is estimated to be at least hundreds of thousands of people.

72.     The members of the Class are so numerous that the joinder of all such persons is impractical and the disposition of their claims in a class action rather than in individual actions will benefit the parties and the Court.

73.     Common questions of law and fact exist as to all members of the class. Questions of law and fact common to the Class, among others, are:

a.      Whether the Class members purchased an item of cookware containing DuPont's Teflon® product;

b.      Whether DuPont represented to the public that its Teflon® product, or the use of cookware coated with Teflon®, was safe;

c.      Whether DuPont has denied that its Teflon® product, or the use of cookware coated with Teflon®, can be potentially harmful to human health;

d.      Whether DuPont had in its possession, or knew of, animal or human test data indicating potential adverse health effects, from one or more of the chemicals or compounds found in its Teflon® product, which DuPont failed to disclose to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public.

e.      Whether DuPont had in its possession, or knew of, blood sample

test results of DuPont workers indicating transplacental movement of one of more of the chemicals or compounds found in its Teflon® product, which DuPont failed to disclose to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public;

f.      Whether DuPont had in its possession, or knew, data regarding deformities suffered by the children of female employees exposed to one or more of the chemicals or compounds in its Teflon® product, which DuPont failed to disclosure to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public;

g.      Whether DuPont had in its possession, or knew of, information or data demonstrating or tending to demonstrate that PFOA present in its Teflon® product may present a variety of risks of injury to human health - including, *inter alia*, cancer, tumors, organ damage, changes in blood chemistry, and vascular disease - which DuPont failed to disclose to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public;

h.      Whether the EPA advised DuPot that evidence of transplacental movement of PFOA, a component of Teflon®, in laboratory rats was "substantial risk data" that DuPont failed to disclose to the consuming public or that DuPont failed to issue adequate warnings to the consuming public about;

I.      Whether DuPont knew or should have known that the heating of cookware coated with its Teflon® product can cause the release of substances, including without limitation PFOA, which are harmful or potentially harmful to human health;

-21-

j.      Whether DuPont had in its possession information or data, which DuPont failed to disclose to the consuming public, or about which DuPont failed to issue adequate warnings to the consuming public, demonstrating or tending to demonstrate that the heating of cookware coated with its Teflon® product can cause the release of substances, including without limitation PFOA, that are harmful or potentially harmful to human health;

k.      Whether DuPont knew or should have known that fumes from heated cookware coated with its Teflon® product can sicken people;

l.      Whether DuPont had in its possession information or data, which DuPont failed to disclose to the consuming public or about which DuPont failed to issue adequate warnings to the consuming public, demonstrating or tending to demonstrate that fumes from heated cookware coated with its Teflon® product can sicken people; and

m.      To what extent Class members have suffered damages and the proper measure of damages.

74.      These common questions of law and fact predominate over any questions that affect only individual Class Members.

75.      Plaintiff's claims are typical of those of other members of the Class.

76.      Plaintiff will fairly and adequately protect the interests of the Class and has retained counsel competent and experienced in class actions.

77.      A class action is the best available method for the fair and efficient adjudication of this controversy. The members of the Class are so numerous that the joinder of all Members is impractical, if not impossible. Because the harm suffered by

individual Class Members, while not inconsequential, may be relatively small, the

expense and burden of individual litigation makes it impractical for members of the Class

to seek redress individually for the wrongful conduct alleged herein. Should each

individual member of the Class be required to bring a separate action, the resulting

multiplicity of lawsuits would cause undue hardship and expense on the Court and on

the litigants. The prosecution of separate actions would also create a risk of inconsistent

rulings which might be dispositive of the interest of other Class Members who are not

parties to the adjudications and/or may substantially impede their ability to protect their

interests. There will be no difficulty in the management of this suit as a class action.


## VIII.   RELEVANT STATUTES

78.   The implied warranty of merchantability in Connecticut is set forth, in

relevant part, as follows:

> (1) ... [A] warranty that the goods shall be merchantable is implied in a contract
> for their sale if the seller is a merchant with respect to goods of that kind. ...(2)
> Goods to be merchantable must at least be such as (a) pass without objection in
> the trade under the contract description; and (b) in the case of fungible goods, are
> of fair average quality within the description; and © are fit for the ordinary
> purposes for which such goods are used; and (d) run, within the variations
> permitted by the agreement, of even kind, quality, and quantity within each unit
> and among all units involved; and (e) are adequately contained, packaged, and
> labeled as the agreement may require; and (f) conform to the promises or
> affirmations of fact made on the container or label if any.

C.G.S. §42a-2-314.

79.   The implied warranty of fitness in Connecticut is set forth, in relevant

part, as follows:

> Where the seller at the time of contracting has reason to know any particular
> purpose for which the goods are required and that the buyer is relying on the

seller's skill or judgment to select or furnish suitable goods, there is... an implied warranty that the goods shall be fit for such purpose.

C.G.S. §42a-2-315.

80      In Connecticut,

A seller's warranty whether express or implied extends to any natural person who is in the family or household of his buyer or who is a guest in his home if it is reasonable to expect that such person may use, consume or be affected by the goods and who is injured in person by breach of warranty. This section is neutral with respect to case law or statutory law extending warranties for personal injuries to other persons. A seller may not exclude or limit the operation of this section.

C.G.S. §42a-2-318.

81.      The Connecticut Unfair Trade Practices Act sets forth in relevant part, as

follows:

Any person who suffers any ascertainable loss of money or property, real or personal, as a result of the use or employment of a method, act or practice prohibited by section 42-110b, may bring an action in the judicial district in which the plaintiff or defendant resides or has his principal place of business or is doing business, to recover actual damages. Proof of public interest or public injury shall not be required in any action brought under this section. The court may, in its discretion, award punitive damages and may provide such equitable relief as it deems necessary or proper.

C.G.S. 42-110g(a).

## COUNT I

## NEGLIGENT DESIGN

82.      Plaintiff repeats and realleges each and every allegation set forth above.

83.      Defendant, as manufacturer of the Teflon® product, had at all times

relevant a duty to Plaintiff and members of the Class to design Teflon® with reasonable

care, as judged against the standard of an ordinary reasonably prudent designer in

similar circumstances, so as to eliminate avoidable dangers.

84.     Defendant, as manufacturer of the Teflon® product further had at all times relevant a duty to consider the environment in which the Teflon® product would be used, i.e. in the typical home kitchen as a cookware coating, and to consider the reasonably foreseeable risks attendant upon that setting. Defendant, as manufacturer, was in a superior position to consumers to ensure Teflon®'s safety by recognizing and curing defects.

85.     Defendant breached these duties by failing to exercise reasonable care to eliminate avoidable or foreseeable dangers, as alleged herein, to the users of the Teflon® product in consumer cookware.

86.     Plaintiff and the members of the Class have purchased cookware containing the Teflon® product as a cooking surface coating. Teflon®, as alleged herein, is an unsafe cookware coating product, which through normal use can expose consumers to toxic and harmful chemicals, particulates, and gases. As a direct and proximate result of the foregoing, Plaintiff and the members of the Class have been damaged.

## COUNT II

## BREACH OF THE IMPLIED WARRANTY OF MERCHANTABILITY UNDER C.G.S § 42a-2-314

87.     Plaintiff repeats and realleges each and every allegation set forth above.

88.     As manufacturer and seller of the Teflon® product, Defendant as a matter of law warrants that its Teflon® product is merchantable and fit for the ordinary purposes for which such goods are used.

89.     As alleged herein, one or more defects or unreasonably dangerous conditions existed at the time the Teflon® product left the Defendant's hands, so that the Teflon® was not reasonably suitable for the ordinary uses, i.e. as a safe cookware coating, for which goods of that kind were sold. Teflon®, as alleged herein, is an unsafe cookware coating product, which through normal use can expose consumers to toxic and harmful chemicals, particulates, and gases. These defective and dangerous characteristics distinguish Teflon® from other products intended to be used as a cookware coating.

90.     In addition, Defendant failed to provide Plaintiff and the Class members with an adequate warning regarding its Teflon® product, i.e. one that would have sufficiently alerted those who may be sensitive to Teflon® and would have allowed Teflon®'s users to balance its risk of harm against its social utility as a cookware coating.

91.     Plaintiff and the members of the Class have purchased cookware containing the Teflon® product as a cooking surface coating for use in a manner that the Defendant intended or that could reasonably have been foreseen by the Defendant.

92.     By manufacturing and selling Teflon® containing one or more defects or unreasonably dangerous conditions, and by failing to adequately warn against those defects and conditions, Defendant has breached the implied warranty of merchantability as set forth in C.G.S. §42a-2-314, thereby directly and proximately causing Plaintiff and the members of the Class to be injured.

### **COUNT III**

-26-

## BREACH OF THE IMPLIED WARRANTY OF FITNESS
## <u>UNDER C.G.S. §42a-2-315</u>

93.     Plaintiff repeats and realleges each and every allegation set forth above.

94.     As manufacturer and seller of the Teflon® product, Defendant had reason to know of the particular purpose, i.e. as a safe cookware coating, for which the Plaintiff and the members of the Class required the Teflon®. Further, Defendant had reason to know that Plaintiff and the members of the Class would rely on and did rely on the Defendant's skill and judgment, as product manufacturer, in selecting and furnishing Teflon® suitable for use as a safe cookware coating. As such, as a matter of law, Defendant warrants that its Teflon® product is fit for this purpose.

95.     As alleged herein, Teflon® product manufactured and sold by Defendant contained one or more defects and unreasonably dangerous conditions, which rendered the Teflon® unfit for use as a safe cookware coating. Teflon®, as alleged herein, is an unsafe cookware coating product, which through normal use can expose consumers to toxic and harmful chemicals, particulates, and gases. As such, the Defendant has breached the implied warranty of fitness as set forth in C.G.S. 42a-2-315, thereby directly and proximately causing Plaintiff and the members of the Class to be injured.

## <u>COUNT IV</u>

## BREACH OF THE IMPLIED WARRANTIES
## <u>UNDER C.G.S. § 42a-2-318</u>

96.     Plaintiff repeats and realleges each and every allegation set forth above.

97.     As alleged above, Defendant has breached the implied warranty of merchantability under C.G.S. §42a-2-314 and the implied warranty of fitness under

C.G.S. §42a-2-315.

98.     Plaintiff and the members of the class purchased, in consumer (i.e. non-commercial) transactions, cookware coated with Teflon® product manufactured and sold by Defendant. Defendant might reasonably expected Plaintiff and the members of the Class to use, consume, or be affected by its Teflon® product.

99.     As such, Defendant is liable, pursuant to C.G.S. 42a-2-318 to Plaintiff and the members of the Class for its breaches of implied warranties, notwithstanding any lack of privity between Defendant on the one hand and Plaintiff and the members of the Class on the other hand.

## COUNT V

## BREACH OF THE PRE-SALE DUTY TO WARN

100.     Plaintiff repeats and realleges each and every allegation set forth above.

101.     Under Connecticut law, DuPont, as manufacturer of the Teflon® product, had at all times relevant a duty to exercise reasonable care to prevent injury to foreseeable users of cookware coated with Teflon®, a product that it knew or should have known is dangerous. The exercise of reasonable care includes a duty to warn where, as here, a manufacturer such as DuPont had reason to suspect that a warning is necessary.

102.     DuPont breached it duty by failing to exercise reasonable care to prevent injury to Plaintiff and the members of the Class, foreseeable users of the Teflon® product, which DuPont knew or should have known to be dangerous, in consumers cookware. DuPont further breached its duty by failing to warn Plaintiff and the members

of the Class as to risks and dangers posed by Teflon®.

103.    Plaintiff and the members of the Class have purchased cookware containing the Teflon® product as a cooking surface coating. Teflon® , as alleged herein, is an unsafe cookware coating product, which through normal use can expose consumers to toxic and harmful chemicals, particulates, and gases. As a direct and proximate result of the foregoing, Plaintiff and the members of the Class have been damaged.

## COUNT VI

## BREACH OF THE POST-SALE DUTY TO WARN

104.    Plaintiff repeats and realleges each and every allegation set forth above.

105.    Under Connecticut law, in the case of a product such as Teflon®, which was negligently designed as originally sold, DuPont had a post-sale duty to take reasonable steps to warn at least purchasers of the product as to its risks as soon as DuPont learned or should have learned of the risk created by its fault. Further, if DuPont made any post-sale discoveries of improvements which could eliminate or tend to eliminate Teflon's® risks created by DuPont's initial fault, DuPont also had a post-sale duty to warn at least the purchasers of the product as to such design changes.

106.    Plaintiff and the members of the Class were purchasers of cookware containing the Teflon® product as a cooking surface coating. DuPont issued no post-sale warnings to Plaintiff or the members of the Class. DuPont therefore breached its post-sale duty to warn.

107.    DuPont is engaged in the business of selling and distributing the Teflon®

product. As such, DuPont is liable for its breach of its post-sale duty to warn because a reasonable person in its position would have provided such a warning, insofar as (I) DuPont knew or reasonably should have known that Teflon® poses a substantial risk of harm, (ii) those to whom a warning might be provided (including Plaintiff and the members of the Class) could be identified and can reasonably be assumed to be unaware of the risk of harm, (iii) a warning could be effectively communicated and acted upon, and (iv) the risk of harm from Teflon® is sufficiently great to justify the burden of providing the warning.

108.    Plaintiff and the members of the Class have purchased cookware containing the Teflon® product as a cooking surface coating. Teflon®, as alleged herein, is an unsafe cookware coating product, which through normal use can expose consumers to toxic and harmful chemicals, particulates, and gases.. As a direct and proximate result of the foregoing, Plaintiff and the members of the Class have been damaged.

## COUNT VII

## UNFAIR TRADE PRACTICES

109.    Plaintiff repeats and realleges each and every allegation set forth above.

110.    This claim is brought pursuant to C.G.S. §42-110a et al.

111.    At all times relevant hereto, Plaintiff and the members of the Class were "persons" within the meaning of C.G.S. §42-110a(3) and are entitled to relief pursuant to the statute in accordance with C.G.S. §42-110g.

112.    At all times relevant hereto, Defendant was engaged in "trade or

commerce" as defined by C.G.S. §42-110a(4).

113.    Plaintiff and the members of the Class entered into consumer transactions to purchase cookware coated with Defendants' Teflon® product.

114.    As alleged herein, during the course of these transactions, Defendant engaged in unfair methods of competition, unconscionable acts or practices, and unfair or deceptive acts or practices, in the conduct of trade or commerce, in violation of C.G.S. 42-110a et al.

115.    Defendant's false statements in Connecticut, contained in its advertising, marketing, and website media, that cookware items coated with its Teflon® product were "safe" and were quality controlled through "rigorous" "testing," and other similar false statements by Defendant, could reasonably be found to have caused consumers to act differently that they would have acted in the absence of such statements.

116.    Likewise, Defendant's failure to disclose and to warn against the risks and dangers of its Teflon® product, as alleged herein, could reasonably be found to have caused consumers to act differently that they would have if presented with complete and truthful disclosures and warnings of Teflon® risks and dangers, in which case they may not have entered into their transactions to purchase Teflon® coated cookware.

117.    Further, Defendant failed to promptly correct its false statements and omissions after later discovering their errors and material misrepresentations.

118.    Defendant's violations of the implied warranties set forth in C.G.S. 42a-2-314, 42a-2-315 and 42a-2-313, as alleged herein, constitute additional grounds in support of a finding that Defendant has violated C.G.S. 42-110a et seq.

119.    Defendant's acts, practices, and conduct, as outlined herein, were willful and knowing violations C.G.S. §42-110a et seq invaded the rights of Plaintiff and the Class to be free from deceptive and unfair business practices.

120.    As a direct and proximate result of Defendant's violations, Plaintiff and the members of the Class are entitled to judgment under C.G.S. 42-110a et seq.; (I) awarding the amount of such actual damages as they prove; and (ii) punitive damages requiring Defendant to refund all sums Plaintiff and the members of the Class paid to purchase cookware coated in Defendant's Teflon® product in Connecticut during the Class Period or to disgorge all profits which Defendant made on account of such Teflon® coated cookware sales to Plaintiff and the members of the Class in Connecticut during the Class Period.

## COUNT VIII

## UNJUST ENRICHMENT

121.    Plaintiff repeats and realleges each and every allegation set forth above.

122.    As alleged herein, Defendant falsely represented and advertised its Teflon® product to be "safe" when used as a coating on consumer cookware. Defendant knew or should have known of the potential risks and dangers associated with its Teflon® product when used as a cookware coating. Defendant failed to disclosed to Plaintiff and the members of the Class, or to adequately warn them about, these risks and dangers.

123.    As a direct and proximate result of Defendant's conduct as alleged herein, Plaintiff and the members of the Class purchased cookware coated with

Defendant's Teflon® product, without understanding Teflon®'s true nature, the dangers it poses to consumers, and the health hazards associated with its use as a cookware coating. In doing so, they purchased Teflon® coated cookware that they would not have purchased had Teflon®'s risks and dangers been made known to the, or they paid a higher price for the Teflon® coated cookware than they would otherwise have paid had those risks and dangers been disclosed to the consuming public.

124.    Plaintiff and the members of the Class purchased Teflon® coated cookware from the licensees of Defendant, who in turn pay Defendant substantial monies for their Teflon® licensing rights. Thus, as a result of their purchases of cookware coated with Defendant's Teflon® product, Plaintiff and the members of the Class have conferred a substantial monetary benefit upon Defendant, which Defendant knew of and appreciated, accepted, and retained.

125.    By way of Defendant's conduct, as alleged herein, Defendant has been unjustly enriched, in an amount yet determined, at the detriment of Plaintiff and the Class, to the extent Defendant received and kept revenues, relating to the sale of cookware coated with its Teflon® product, which Defendant would not have received absent its improper conduct. As such, Defendant's acceptance and retention of the monetary benefit alleged herein has occurred under circumstances which make it inequitable if a restitution payment is not made to Plaintiff and the Class and if Defendant is not ordered to disgorge its ill-gotten profits derived from sales of Teflon® coated cookware.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff, on behalf of himself and the members of the Class pray for judgment as follows:

1.      Declaring this action to be a class action properly maintained pursuant to Rule 23 of the Federal Rules of Civil Procedure;

2.      Declaring this action to be a class action properly maintained pursuant to C.G.S. §42-110g(b) and §52-105;

3.      Finding Defendant liable as alleged in this Complaint;

4.      With respect to Counts I-VI, awarding Plaintiff and the Class actual damages, including where appropriate consequential damages, together with pre-judgment and post-judgment interest thereon;

5.      With respect to Count VII, awarding Plaintiff and the Class actual damages, and punitive damages;

6.      With respect to Count VIII, entering an award of restitution to Plaintiff and the Class;

7.      Ordering disgorgement by Defendant of all ill-gotten profits related to the conduct alleged herein;

8.      Ordering creation of a fund for ongoing medical monitoring of consumers who have purchased cookware coated with Defendant's Teflon® product;

9.      Ordering creation of a fund for independent scientific researchers to further investigate the potential for adverse effects to consumers who have used cookware coated with Defendant's Teflon® product;

10.      Entering an injunction barring Defendant from continuing in the licensing,

-34-

design, manufacture, marketing, advertising, sale, and/or distribution of its Teflon®

product for purposes of being used as a cookware coating, or alternatively, an injunction

requiring that Defendant and its licensees ensure that an adequate warning, fully

disclosing all of  Teflon®'s risks and hazards, accompany any Teflon® coated cookware

products to be sold in the future;

11.     Ordering Defendant to replace and/or exchange all existing Teflon®

coated cookware in the possession of Plaintiff and the members of the Class with

comparable products containing non-hazardous "non-stick" coatings or properties, or

alternatively, with the monetary equivalent thereof;

12.     Awarding Plaintiff and the members of the Class their costs and expenses

of this litigation, including reasonable attorneys' fees and experts' fees; and

13.     Awarding Plaintiff and the members of the Class such other and further

relief as may be just and proper under the circumstances.

## DEMAND FOR JURY TRIAL

Plaintiff hereby request trial by jury of all issues so triable as a matter of law.

Dated: March 14, 2006

Thomas Clark
By his attorneys,

_____
Stephen P. Wright ct02255
James R. Winkel ct18304
Harlow, Adams & Friedman, P.C.
300 Bic Drive
Milford, CT 06460
203-878-0661
203-878-9568 - Fax
spw@quidproquo.com
jrw@quidproquo.com

Of Counsel:

| | |
|---|---|
| Thomas G. Shapiro | Kluger, Peretz, Kaplan & Berlin, P.L. |
| Matthew L. Tuccillo | 201 S. Biscayne Blvd., Suite 1700 |
| Shapiro, Haber & Urmy, LLP | Miami, FL 33131 |
| 53 State Street | Tel: (305) 379-9000 |
| Boston, MA 02109 | |
| Tel: (617) 439-3939 | |

A:\Individual Complaint.wpd